RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0117p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TODOR D. ALEXANDROV,

    *Petitioner-Appellant,*

    *v.*

ALBERTO GONZALES, Attorney General of the
United States,

    *Respondent-Appellee.*

No. 04-4458

>

On Appeal from the Board of Immigration Appeals.
No. A75 370 289

Argued: March 16, 2006

Decided and Filed: April 4, 2006

Before: MARTIN, NELSON, and COLE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Stanley J. Horn, AZULAY, HORN & SEIDEN, Chicago, Illinois, for Petitioner. Song E. Park, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Stanley J. Horn, Saadia Siddique, AZULAY, HORN & SEIDEN, Chicago, Illinois, for Petitioner. Song E. Park, M. Jocelyn Wright, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

    MARTIN, J., delivered the opinion of the court, in which COLE, J., joined. NELSON, J. (pp. 13-14), delivered a separate dissenting opinion.

---

**OPINION**

---

    BOYCE F. MARTIN, JR., Circuit Judge. Todor D. Alexandrov was born on August 21, 1971, and is a native and citizen of Bulgaria. Alexandrov entered the United States in 1996 on a student visa to attend McNeese State University in Louisiana. He never attended the university, but on May 6, 1997, filed an administrative request for asylum. On September 26, 1997, Alexandrov received notice that his asylum application had been approved. Nearly six months later, however, the INS issued a notice of intent to terminate his asylum status based on its conclusion that Alexandrov had submitted fraudulent documents in support of his application. After a hearing, the immigration court agreed that the documents were fraudulent and that Alexandrov had submitted

a frivolous asylum application within the meaning of 8 U.S.C. § 1158(d)(6) and 8 C.F.R. § 1208.20.[1] Based on this finding, the court also made an adverse credibility finding against Alexandrov and denied all forms of relief.[2]  The Board of Immigration Appeals affirmed in a conclusory order adopting the findings of the immigration court.  For the following reasons, we GRANT the petition for review and REMAND for further consideration — particularly of Alexandrov's adjustment of status to a lawful permanent resident based on his derivative eligibility — before a different immigration judge.

## I.

Alexandrov's application for asylum is based on his membership in Omo Ilinden, a political party in Bulgaria that advocates the causes of the Macedonian minority.[3]  Based on his membership in this group, Alexandrov claims that he was arrested, questioned, and beaten by the police on several occasions.  He further claims that he was subpoenaed by the Bulgarian authorities to appear in court, at which time he fled to the United States.  After arriving in the United States, Alexandrov claims to have learned that he was tried and sentenced in absentia to prison for five years.  After granting Alexandrov's application for asylum, the INS then terminated his asylum status based on "new evidence" that the documents he used in support of his claim were forgeries.

Alexandrov described several instances of persecution that led him to seek asylum. All incidents stem from his membership in Omo Ilinden.  Alexandrov testified that the first incident occurred at a demonstration where he was the co-organizer.  He alleges that two police officers came up to him, grabbed him, interrogated him, and started beating him.  They then put him in a car and took him to a police station.  At the police station he was interrogated about Omo Ilinden and was beaten and released after "7, 8 hours of detention."  Alexandrov testified that he suffered only bruises from this beating.  The second arrest allegedly occurred in November 1995 when

---

[1] 8 U.S.C. § 1158(d)(6) provides that "[i]f the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application."  The implementing regulation, 8 C.F.R. § 1208.20 states: "For applications filed on or after April 1, 1997, an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. For purposes of this section, an asylum application is frivolous if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim. For purposes of this section, a finding that an alien filed a frivolous asylum application shall not preclude the alien from seeking withholding of removal."  A finding of frivolousness is commonly referred to as the "death sentence" of immigration proceedings.  *See, e.g.*, *Muhanna v. Gonzales*, 399 F.3d 582, 588 (3d Cir. 2005).

[2] While this appeal was pending before the Board, Alexandrov filed a Motion to Reopen and Remand before the immigration court based upon the fact that his wife had received an approved I-140 via petition which also permitted Alexandrov to adjust his status to lawful permanent resident as a derivative.  The INS did not respond in opposition to the motion and the Board then granted the motion without comment.  On remand, the immigration court expressed its dismay at the case being back before the court, because its finding that Alexandrov had submitted a frivolous application precludes all forms of relief, including that which was the basis for the Motion to Reopen.  JA 40-41 ("[L]ook, I don't I don't understand how the Board operates.  From what I've seen in my four years as [a] judge they do things to get rid of cases rather than solve them.").  Thus, the immigration court reiterated its finding that the documents were fraudulent "by clear, and convincing, and unequivocal evidence," and reiterated its previous conclusion.  On appeal, the Board affirmed this judgment without comment as to why it previously remanded the case.

[3] Alexandrov points to a 1997 Department of State Report, "Bulgaria — Profile of Asylum Claims & Country Conditions," which notes that "OMO-Ilinden[ is] an organization that the government refuses to register on the grounds that it illegally advocates separatism. Lacking registration, it has on occasion been denied permission for meetings and marches, leading to confrontations with the authorities. While it is possible that activists might encounter mistreatment under some circumstances, mere membership and/or support do not, in our view, form grounds for significant concern."

Alexandrov was visiting his parents in Lom. He testified that he was accosted on the street by police officers and taken to the police station for questioning. Alexandrov testified that he was interrogated, threatened, slapped, but not beaten, and then released. The third incident occurred in Musala in January 1996 when Alexandrov was the assistant secretary of Omo Ilinden and was again the organizer of a demonstration. He claims that the police interrupted the demonstration and arrested him and a few friends. Following the arrest, he and his friends were questioned separately at the police station and held overnight. Alexandrov testified that they were held for approximately sixteen hours, beaten with a club and hands, and eventually released. The fourth incident occurred on July 27, 1996 after a meeting of his group. He claims the police waited outside of their meeting place and then beat the meeting attendees. Alexandrov claims to have been hit over the head and lost consciousness. He was taken to the police station, questioned, beaten, kicked, and forced to sign a declaration that Omo Ilinden was a terrorist organization. Alexandrov testified that he was told he would not leave the room alive if he did not sign the declaration. He claims he was released after signing the declaration. *Id.* Alexandrov testified that he suffered fractured ribs and a concussion from the beating. After this, he claims that the police "became more arrogant," coming to his place of business, looking through files, going to his home and questioning his girlfriend, and then issued a subpoena to appear in court. He claims to have been issued the subpoena on October 20, 1996. Alexandrov also testified regarding other injuries suffered as a result of the four beatings, including broken bones and a broken tooth. He also testified to seeking medical treatment at hospitals following the beatings and submitted certificates from the hospitals.

Alexandrov testified that after receiving the subpoena he fled the country and later learned that he was convicted in absentia and sentenced to five years in prison on December 15, 1996. Alexandrov also testified that the National Investigative Service (NIS), upon which the government relied in determining that the subpoena was a forgery, is loyal to the new communist regime that persecuted Alexandrov.

The immigration court also questioned Alexandrov. During this questioning, Alexandrov stated that he was assistant secretary of Omo Ilinden for the Montana, Lom district in Northwest Bulgaria. The immigration court also questioned Alexandrov regarding a State Department report that says the majority of Macedonians live in the south of the country. Alexandrov testified that "there are also Macedonians throughout, throughout the country." He testified that his arrests occurred in the northwest and southwest — with the majority of the incidents of arrest, beating, and subpoena occurring in the southwest.

In the proceedings before the immigration court, the INS's entire claim rested upon the alleged forgeries. The Service did not dispute the alleged arrests and beatings that Alexandrov claimed to have suffered. The Service's evidence consists entirely of two memoranda prepared by the United States Embassy Sofia and the testimony of John McGruder. The first "Memorandum" (hereinafter, the Grencik Memorandum) is dated February 13, 1998, and is "From: Embassy Sofia, Consular Section, Theresa Grencik — Vice Consul." The Grencik Memorandum states, in its entirety:

> The Consular Section has reviewed the documents submitted in support of this asylum application and has confirmed the following defects:
>
> 1. Alexandrov has presented a court decision sentencing him to five (5) years of imprisonment, allegedly issued by the Regional Court in Lom on 15 DEC 1996. The Archives Department of the Regional Court stated that the court has no record of such a decision in its files. The court did not have a judge (referred to as "chairman" in the document) named Nikolov in 1996. Finally, this document presented is on the form used for decisions in civil court cases: convictions are issued on a different form which is entitled "Conviction" not "Decision."

2. Alexandrov has submitted a copy of a subpoena allegedly issued on 15 DEC 1996 (the same date as the purported conviction, above) by the National Investigation Service (NIS) branch in Montana and signed by Captain R. Kostadinov. The NIS has no record of having issued such a subpoena, nor did it employ a Captain R. Kostadinov in 1996 or thereafter.

The most significant fraud indicator in this document is that the NIS would not issue a subpoena summoning a person to the Regional Court. The courts have independent subpoena authority and subpoena forms. A case may be referred to a court only after the conclusion of the NIS investigation, at which time a prosecutor would evaluate the case and, if necessary, would request the court to issue a subpoena. It is unheard of for the NIS to summon a person to court.

3. Alexandrov submitted medical certificates allegedly issued by the Regional Hospital in Lom and the Municipal hospital in Montana. Neither institution has any record of these certificates.

The Consular Section concludes that these documents are all forgeries.

Recognizing problems with the Grencik Memorandum, on August 27, 1998, Kathleen L. Alcorn, Assistant District Counsel, Detroit, Michigan, sent a letter to Peter Moffat, Office of Asylum Affairs, requesting a second analysis. First, with regard to the Grencik Memorandum's conclusion that the Regional Court did not have a judge named "Nikolov," Ms. Alcorn noted that the documents very clearly note that "Nikolov" was the translator of the document and did not appear to be the judge who signed the document. Additionally, with regard to the Grencik Memorandum's conclusion that no subpoena issued on December 15, 1996 existed, Ms. Alcorn noted that Alexandrov claimed to have received a subpoena on October 20, 1996. Acknowledging that "[t]hese two errors could significantly hurt the case in court," Ms. Alcorn requested a second review of the documents.

Thus, another Memorandum (hereinafter, the Hazel Memorandum) dated September 30, 1998 — the same day as the hearing and decision in this case — was issued "From: Embassy Sofia, Consular Section, Mike Hazel — Vice Consul." The Hazel Memorandum states, in its entirety:

As per the request of Kathleen Alcorn, Assistant District Counsel in Detroit, Michigan, the Consular Section has reexamined the documents submitted in support of of [sic] Mr. Alexandrov's asylum application. This review was conducted with special attention to the two errors pointed out by Ms. Alcorn.

1. In the case of the the [sic] name of the judge who signed the court decision sentencing him to five years imprisonment that was allegedly issued by the Regional Court in Lom on 15 DEC 1996, Ms. Alcorn stated that Nikolov is the translator of the document, not the judge. In fact, the judge's name is V. Nikolov, as evidenced by the signature in the bottom right corner of the document. The translator's name is Nikolai Nikolov. Therefore, the fact that the court did not have a judge named Nikolov in 1996 remains evidence of the inauthenticity of the court conviction, as are the other defects mentioned in Theresa Grencik's memo dated February 13, 1998. Additionally, according to court records, case number 135 [the case number is approximately one third down the page near the right edge] is a case between G. Kostadinov and R. Kaltchevu.

2. Ms. Alcorn correctly points out that the subpoena was issued on 20 OCT 1996. Despite this error, the subpoena has a number of other flaws. The National Investigative Service (NIS) still has no record of having issued such a subpoena on

20 OCT 1996, or on any other day. As noted in the initial memo, the NIS did not employ an R. Kostadinov in 1996. Moreover, after 1995 NIS investigators did not have rank, so if Kostadinov did work for NIS, he would not have signed with the rank "Captain." The other defects noted in the previous memo regarding the protocol of the issuance of a subpoena and NIS summoning a person to court were confirmed.

At the hearing, John McGruder testified via speaker phone on behalf of the Service regarding the forgeries.[4] McGruder testified that he spoke with Hazel the morning prior to testifying. The Service rested on the report and merely had McGruder confirm that it was from the Embassy. On cross-examination, McGruder was asked about the preparation of the reports. Regarding the court records, McGruder testified that the statements "would have been made by somebody in the Regional Court" and that they would have been made to the Embassy's investigating officer. He then testified that it was his understanding that the investigating officer went to the Regional Court to get clarification on the documents following the errors in the Grencik Memorandum. He testified that the investigating officer learned that there is a judge named Nikolov. This would, however, contradict both memoranda's findings that there is no judge named Nikolov.[5]

McGruder was then asked how the Embassy determined that the court did not have a record of the decision in its files. McGruder testified that he did not personally know, but based on his understanding of general procedures, the Hazel report was saying "that the organized department stated that the court has no record of such things. Now sometimes in these reports they will provide the name of the person they interviewed. This time they did not." McGruder then conceded that he had no knowledge as to how the information was obtained from the court. He testified that based on his general knowledge of procedure, "it would have been a position of someone who was in authority and generally — we do these sorts of things routinely." He then conceded, however, that "since I don't know the individual with whom [the embassy] have spoken in this case, I cannot say categorically that it was a person of any particular authority."

McGruder was then asked if he even knew who the embassy's investigator was. He testified, "Again, I do not know. I know that Mike Hazel is the one who signed the document." McGruder was then asked whether the signatories of the two memos, Grencik and Hazel, spoke Bulgarian. McGruder did not know. Regarding Grencik, McGruder testifed that he "never met the woman. I've never talked with her at all. I've only talked with Mike." Further, regarding any conclusions in the Grencik Memorandum, McGruder testified that he believed "It was based on standard procedures for the department, but I do not know in this case because like I said I've never talked with the woman at all."

McGruder was then asked whether Grencik and Hazel themselves conducted the investigations or whether it could have been someone else who investigated and authored the reports. McGruder testified that he had no idea whether Grencik or Hazel were directly involved and it was "certainly possible" that someone else investigated and authored the report. He stated that,

> We have investigating officers and it might have been signed off on by the vice consul who is the head of the section. Again that's standard procedure. Sometimes

---

[4]McGruder testified that he was the Executive Director for the Bureau of Oceans, Environment, Science, and Democracy, Human Rights and Labor, but was on a temporary detail to the Office of Asylum Affairs, which is in the Bureau of Democracy, Human Rights, and Labor, all within the U.S. Department of State.

[5]Alexandrov also cites the Department of State's Country Reports on Human Rights Practices for 1996, which states that "most citizens have little confidence in their judicial system."

we have employed, and I don't know whether Bulgaria did it in this case or not, but we have employed local nationals who were former policemen or former investigators. . . . I don't know what happened in this case.

He then testified again that he did not know who the investigators were but that "the important thing from my perspective and the State Department perspective, it may be not appropriate legally, but the ones who are taking responsibility for the documents are the individuals, the vice consuls who signed these sheets."

McGruder was then asked the following: "But you have no idea who they got this information from, whether they got the information directly from the Bulgarian court officials or through investigators and you don't know what Bulgarian court officials they got the information from?" McGruder responded: "That's certainly true."

Regarding the subpoena, McGruder's answers were the same. JA 89 ("I'm afraid the answer is going to be the same. As far as I'm, I know, [Grencik] is taking responsibility for the statement. Whether or not she initially made it or not, I don't know. . . . Because this document, this statement may well have been made by [Grencik]. It may have been made even by her predecessor. I don't know."). Counsel then asked McGruder what type of records the National Investigative Service keeps. McGruder testified that, "I can't tell you. Again, I, I can only tell you what it's like in other countries of similar background and a lot of them are not electronic databases. They are hand records just like you might have expected in the U.S. maybe 20 years ago." Counsel asked whether NIS might have made a mistake, "[e]specially if they are given the wrong date to look for." McGruder responded that he "wouldn't want to venture there," but that it was "very possible" the NIS looked in the wrong place for the subpoena and that he just "d[idn't] know how many different ways they would have tried to run a search." Later on, McGruder essentially agreed that the information likely came from an unidentified person in the NIS who gave it to an unidentified person at the consular's office, but that "Mike Hazel is taking full responsibility." Counsel then confirmed his understanding of the subpoena issue:

> And again I'd just like to confirm that we don't know the person at the NIS who made that statement. We don't know the authority, the authority the person had to make that statement. We don't know what kind of personnel filing system did they search to confirm that information. And we don't, we don't know who is the consulate they made that statement to.

McGruder responded: "These are all true statements." McGruder did caution counsel that "a vice consul at the embassy has taken full responsibility for based on the information that she may have collected herself or she may have gotten from somebody else." But, he conceded that, regarding the information in Grencik's Memorandum, "I don't know. I've never talked with her. She has taken responsibility for that statement. And whether it's her conclusion or her accepting of a conclusion from others, I do not know."

Regarding the medical certifications the government alleged to be forged, McGruder was likewise unhelpful. He testified that he had no country specific knowledge about Bulgaria or how the hospital would keep records. McGruder testified that he was not sure how the investigation was conducted — "I, I really don't know the procedures and I suspect they did (indiscernible) whoever did the investigation." Counsel then confirmed: "You don't know who at either of these hospitals searched for these records, these certificates, you don't know who at the consulate they told they didn't find these certificates?" McGruder responded: "True."

Counsel then returned to the Grencik Memorandum. Regarding Grencik, McGruder testified, "As I mentioned previously, I have never met the woman. I have no idea. Her name is a

sheet on this piece of paper to me and that's all." He testified, however, that he had spoken on the phone with Hazel a "number of times." McGruder was asked what kind of training and background Hazel had and McGruder did not know anything specific. On redirect, the government asked whether the information was "collected in the ordinary course of the business of the State Department" and "relied upon by the State Department" and McGruder said that it was.

It was on the basis of the Grencik Memorandum, Hazel Memorandum, and McGruder's testimony that the immigration court determined that, by clear, convincing, and unequivocal evidence, the documents were fraudulent and Alexandrov's application for asylum was frivolous. Essentially, the court found determinative that McGruder "did confirm that these reports are used every day during the course of business within the State Department and that they are relied upon." The immigration court also found, based essentially upon the allegedly fraudulent documents, that Alexandrov's testimony was not credible.

For the adverse credibility finding, the immigration court also pointed to a few instances of testimony that it found incredible. The first was with regard to Alexandrov's alleged detention and beating for seven to eight hours. The immigration court stated: "First of all the Court finds that this is just inherently incredible. They're going to, in the Court's opinion, probably detain someone more than 7 or 8 hours if they go to the effort of beating him up and hauling him to the police station unless he provides some cogent information." The second instance of incredible testimony, according to the immigration court, was during Alexandrov's description of his second arrest while visiting his parents in Lom. The immigration court stated that Alexandrov

> said he was not struck, but then later on he said he was slapped. Again the Court detected that as being a waffling and based upon the way the questioning evolved he suddenly realized that what he was telling the Court would not get him an asylum application so therefore he suddenly decided he'd better say he had been slapped.

The entirety of this testimony, however, consists of this: "Q: Were you struck? A: No, I was threatened, but not, not really. I was slapped a few times."

The immigration court identified a third instance of incredible testimony regarding the fourth incident where Alexandrov testified he was beaten and detained overnight. The immigration court stated:

> Again he used the term I believe, indicating that he was not at all sure that what he was telling the Court was true. He was held and then he said I think I was held about 16 hours. Again, the Court believes if you're going to be held 16 hours, you're not going to say I think I was held 16 hours. You would say I was held 16 hours or I was held almost all of the day; something other than a qualifying I think I was held 16 hours.[6]

The immigration court then questioned why it was so easy for Alexandrov to leave the country on a student visa if the government had issued a subpoena for his trial. Finally, regarding the medical certificates discussed in the Grencik Memorandum, the immigration court stated: "But the Court is not willing to find as a matter of law that this was fraudulent information." The immigration court did not explain why it found the other documents mentioned in the memos fraudulent as a matter of law and therefore a frivolous application, but not the medical certificates

---

[6]Alexandrov's testimony on this point was as follows: "Q: How long were you held? A: I, I think I was held about 16 hours. Q: Were you beaten? A: Yes. What exactly did they do to you? A: They beat me with a club and, and hands."

when the evidence was entirely the same.  The Board of Immigration Appeals affirmed, following its apparently erroneous granting of the motion to reopen, *see supra* n. 2, and Alexandrov appeals.

## II.

Alexandrov challenges the immigration court's adverse credibility finding on the basis that it is not supported by substantial evidence.  He also argues that he was denied due process based on the immigration court's consideration the Grencik and Hazel Memoranda.  For the reasons that follow, we find Alexandrov's argument persuasive on both points.

Because the Board of Immigration Appeals adopted the immigration court's decision without comment, this Court reviews the immigration court's decision as the final administrative order. *Hasan v. Ashcroft*, 397 F.3d 417, 419 (6th Cir. 2005).  Questions of law are reviewed de novo, *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004), and this Court affirms an immigration court's decision that a petitioner has failed to establish eligibility for asylum if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole," *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

Pursuant to the Immigration and Nationality Act, an asylum applicant must show that he is a "refugee."  8 U.S.C. § 1158(b).  A refugee is a person who is unwilling or unable to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).  The application bears the burden of proof in demonstrating that he has suffered past persecution or has a reasonable fear of future persecution.  8 C.F.R. § 1208.13(a).

We turn first to Alexandrov's due process argument — specifically, Alexandrov's claim that the finding of frivolousness was erroneous.  Under 8 C.F.R. § 1208.20, "a finding of frivolousness does not automatically flow from an adverse credibility determination." *Muhanna*, 399 F.3d at 589. Rather, the immigration court must

> specifically find[] that the alien knowingly filed a frivolous asylum application. For purposes of this section, an asylum application is frivolous if any of its material elements is deliberately fabricated. Such a finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

8 C.F.R. § 1208.20.

The Due Process Clause also protects an alien's rights in these circumstances.  Although the Federal Rules of Evidence do not apply in immigration proceedings, *Kasa v. Gonzales*, 128 Fed. Appx. 435, 440 (6th Cir. 2005) (citing *Dallo v. INS*, 765 F.2d 581, 586 (6th Cir. 1985)), immigration courts must still provide due process of law. *Ileana v. INS*, 106 Fed. Appx. 349, 353-54 (6th Cir. 2004); *see also Ezeagwuna v. Ashcroft*, 325 F.3d 396, 405 (3d Cir. 2003) (noting that "[t]he test for admissibility of evidence . . . is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law.") (quoting *Bustos-Torres v. INS*, 898 F.2d 1053, 1055 (5th Cir. 1990)).

"Highly unreliable hearsay might raise due process problems." *Yongo v. INS*, 355 F.3d 27, 31 (1st Cir. 2004).  This Court has also cautioned against excessive reliance upon hearsay reports prepared by the Department of State. *Rexha v. Gonzales*, 2006 WL 229796, *5 (6th Cir. 2006) ("Although . . . we believe that the report in question here passes muster, we reiterate emphatically that immigration courts and the Board should exercise extreme caution in relying on such reports to deny asylum claims.  Asylum applicants are entitled to the due process of law and excessive

deference to the government or a shallow evaluation of the evidence by the immigration court would be unwarranted. *See Benslimane v. Gonzales*, 430 F.3d 828 (7th Cir. 2005) (Posner, J.).").[7]

The leading case in this area is *Ezeagwuna v. Ashcroft*, 325 F.3d 396 (3d Cir. 2003). In *Ezeagwuna*, the immigration court and Board "relied almost entirely on a letter from the Department of State that contained the conclusions of an investigation in Cameroon." *Id.* at 398. The letter was from "John Larrea, Vice Consul of the Embassy of the United States in Yaounde, Cameroon" and "sets forth in a summary fashion the results of an investigation conducted into five documents submitted by [the petitioner]. . . . The letter concludes that each of these documents is fraudulent. . . . No investigative report is provided, nor is there any information about the investigation or the investigator." *Id.* at 401. The Third Circuit found that the letter "does not satisfy our standards of reliability and trustworthiness." *Id.* at 406. The court was troubled by the dates of the letter in that it was only provided to the petitioner a few days before the hearing. *Id.* Most concerning to the court was that the

> letter is multiple hearsay of the most troubling kind. It seeks to report statements and conduct of three declarants who are far removed from the evidence sought to be introduced. They are purportedly individuals who told the investigator that certain aspects of the documents appeared to be fraudulent. Not only does Susser have no direct knowledge of the investigation, he did not even directly communicate with John Larrea, the declarant whose hearsay statements he is repeating. Therefore, the current speaker - Susser - was unable to even evaluate the credibility of the immediate preceding declarant - Larrea - who of course was himself only a proponent of hearsay. Further, we do not know whether Larrea had any interaction with "the investigator," only referred to as "she," who reports to Larrea what others have purportedly told her.

*Id.* at 406. Further, the court was troubled that some of the statements were likely made by Cameroonian nationals working for the government from which the petitioner was seeking asylum. *Id.* The court stated that it was "concerned that the INS is attempting to use the prestige of the State Department letterhead to make its case and give credibility to the letter's contents." *Id.* at 407 (noting that "the Board's decisions cannot be sustained simply by invoking the State Department's authority. We are expected to conduct a review of the Board's decisions, and that procedural safeguard would be destroyed if the Board could justify its decisions simply by invoking assertions by the State Department that themselves provide no means for evaluating their validity . . . The Board cannot hide behind the State Department's letterhead."). Finally, the court noted that "we have absolutely no information about what the 'investigation' consisted of, or how the investigation was conducted in this case. In combination with the concerns we note above, we believe that the complete dearth of information about the investigator or the investigation undermines the [] letter as not only untrustworthy, but also unhelpful." *Id.*[8]

---

[7] *See also Rexha*, 2006 WL 229796, at *5 n.3, where this Court cautioned that "[e]xcessive reliance on these reports is particularly dangerous in cases . . . where the petitioner alleges that the report was prepared with the assistance of someone from the government from which he is fleeing."

[8] The Third Circuit attached the letter as an appendix to the opinion. It stated in full:

Dear Ms. Feldman:I am writing to forward the results of an investigation, by a Foreign Service post, of documents presented in support of the asylum application of the above-named individual. These documents were forwarded to us by your office. Regarding the Medico Legal Certificate, the Director of Administrative affairs in the Provincial Hospital of Bamenda stated that the round form and the stamp used for the Certificate are fake, and that there is no medical record at the hospital for Glory Obianuju. He also noted that no doctor by the name of James N. Chefor has ever worked at the hospital. The investigator in the U.S. Embassy in Yaounde, Cameroon, concluded that this document

This Court discussed embassy reports in *Kasa*, 128 Fed. Appx at 440-41. We noted that first, "the petitioner must be given a meaningful [opportunity] to respond to the harmful evidence," and second, "whether the evidence is trustworthy and reliable affects the fundamental fairness of its admission." *Id.* at 440 (internal citations omitted). Citing *Ezeagwuna*, we distinguished the report before us by noting that the report

> indicated the background and experience of the investigator. It also summarized the investigation that led to the conclusion that Kasa had submitted false documentation. . . . Though any hearsay document creates doubts as to its trustworthiness, the report confirms its reliability and trustworthiness by specifying the steps taken in the investigation and clarifying that the purpose of the investigation was never made clear to members of the Albanian government.

*Id.* at 440. Additionally, we stated that "[t]he report's detailed summary of the investigation that took place not only buttressed the report's reliability, it also allowed petitioner a meaningful opportunity to rebut the Embassy report." *Id.*[9] Thus, "where a hearsay document is admitted but not primarily relied upon and the petitioner receives the opportunity to rebut the document's conclusions through his witnesses, the fundamental fairness of the proceedings has not been impinged." *Id.* at 441.

> A.     *Pursuant to these standards, the immigration court's reliance upon the hearsay Department of State Reports violated Alexandrov's due process rights.*

The two memoranda in Alexandrov's case are even less reliable than the letter in *Ezeagwuna*. In *Ezeagwuna*, the letters at least stated who provided the investigator with information about the document's reliability. 325 F.3d at 411-12. The investigator relied upon the "Director of Administrative affairs in the Provincial Hospital of Bamenda" as well as "the president of the High Court of Bamenda." *Id.* The Grencik and Hazel memoranda here, however, lack even this degree of detail. The Grencik Memorandum is clearly unreliable as both of its points were admittedly mistaken. The Hazel Memorandum does not clarify to any degree what type of investigation was conducted or who the investigator was. Moreover, McGruder's testimony does not clarify whether there is in fact a Judge Nikolov at the Regional Court. In fact, McGruder's testimony casts further doubt on the reliability of the Department of State reports and is entirely unhelpful. We do not know who the investigator was or if there was more than one investigation or the qualifications of a supposed investigator. We do not know whether Grencik or Hazel participated in the investigations. We do not know whether a Bulgarian investigator was used. We do not know how the investigation was conducted. We do not know who provided the Department of State with the information from

---

is fraudulent. Regarding the affidavits dated October 22 and November 15, 1999, the president of the High Court of Bamenda stated that the round stamp and the Commissioner for Oaths stamps are fake. He further stated that neither affidavit had been registered or sworn in the High Court of Bamenda. It is the Embassy investigator's conclusion that this document is fraudulent. It is the Embassy investigator's conclusion that arrest warrant and application for bail documents are also fraudulent. The arrest warrant lacks key information such as the charge number and dates of appearance and time. The application for bail was allegedly signed by an individual who has never served as president of the court. We hope that this information is helpful. If we can be of any further assistance. Please do not hesitate to contact us.

Sincerely, Marc J. Susser Director Office of Country Reports and Asylum Affairs

[9]We concluded by stating that "[t]his suggests that the use of this report as a means of proof was not fundamentally unfair. Further contributing to the fundamental fairness of this report's admission is the IJ's failure to rely on the report as the sole, or even primary, reason for concluding that the identification card was false." *Kasa*, 128 Fed. Appx. at 441.

the court, NIS, or hospitals. There is not much that we do know aside from the apparent conclusions of the mysterious investigation.

Furthermore, the Hazel Report is dated September 30, 1998. This is *the same day* of Alexandrov's hearing and the oral decision where he was denied asylum and found to have submitted a frivolous petition. Alexandrov was not given any opportunity to rebut the conclusions of the report other than to testify in opposition to the reports' conclusions. Thus, we conclude that the immigration court failed to comply with the Regulations and therefore the court's finding cannot be sustained.

Additionally, the immigration court's decision regarding the frivolous application was based *entirely* on the Department of State reports and McGruder's testimony. There was no other evidence whatsoever to indicate that the documents were fraudulent. We conclude that the Department of State reports in this case do not meet our standards of trustworthiness and reliability and therefore were improperly relied upon by the immigration court. Because they were the sole pieces of evidence for the government, and the sole factor the immigration court relied upon in making its frivolous application determination, Alexandrov was clearly prejudiced by their admission.[10] We therefore VACATE the finding of frivolousness as it was based on evidence admitted in violation of the Due Process Clause.

> B.     *The immigration court's adverse credibility finding is not supported by substantial evidence.*

In this case, the immigration court also made an adverse credibility finding. Credibility findings "must be supported by specific reasons," *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004), and adverse credibility findings must "go to the heart of an applicant's claim . . . [and] 'cannot be based on an irrelevant inconsistency.'" *Id.* (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004)). An immigration court's findings must also be based "on the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481.

Once the hearsay report is excluded, the immigration court's adverse credibility finding is not supported by substantial evidence. As noted earlier, the immigration court found three instances of Alexandrov's testimony incredible. First, with regard to Alexandrov's testimony that he was arrested, detained, and beaten for seven to eight hours, the immigration court stated:

> First of all the Court finds that this is just inherently incredible. They're going to, in the Court's opinion, probably detain someone more than 7 or 8 hours if they go to the effort of beating him up and hauling him to the police station unless he provides some cogent information.

Essentially, the court found Alexandrov's testimony incredible because, in the immigration court's opinion, the detention and beating should have lasted longer. Second, the immigration court found that Alexandrov

> said he was not struck, but then later on he said he was slapped. Again the Court detected that as being a waffling and based upon the way the questioning evolved he suddenly realized that what he was telling the Court would not get him an asylum application so therefore he suddenly decided he'd better say he had been slapped.

---

[10] It is also troubling that the immigration court concluded that the court records and subpoena were clearly fraudulent, but did not make the same finding with regard to the medical records, when the evidence was entirely the same. The court does not explain why the memoranda are sufficient with regard to the two documents but not the medical records.

The entirety of this testimony, however, consists of this: "Q: Were you struck?  A: No, I was threatened, but not, not really.  I was slapped a few times."

The immigration court identified a third instance of incredible testimony regarding the fourth incident where Alexandrov testified he was beaten and detained overnight.  The immigration court stated:

> Again he used the term I believe, indicating that he was not at all sure that what he was telling the Court was true.  He was held and then he said I think I was held about 16 hours.  Again, the Court believes if you're going to be held 16 hours, you're not going to say I think I was held 16 hours.  You would say I was held 16 hours or I was held almost all of the day; something other than a qualifying I think I was held 16 hours.[11]

We do not lend any credence to the immigration court's first and third findings and are compelled to conclude that they are not supported by substantial evidence.  They have no basis in fact and have little, if any, basis in reason.  Both findings appear to be nothing more than the immigration court's personal beliefs on how long proper beatings and detentions should last.  We will not find substantial evidence supporting an adverse credibility determination based on the pure speculation of an immigration court.  The second finding — that Alexandrov changed his story to claim he was slapped — even if we were to agree with the immigration court, does not alone support an adverse credibility determination.  Although all we have is the transcript before us, we find the immigration court's conclusion to be a questionable one based on what appears in the transcript.  For these reasons, the immigration court's adverse credibility determination is not supported by substantial evidence.

## III.

For the reasons discussed above, we GRANT the petition for review, VACATE the immigration court's decisions, and REMAND for further consideration before a different immigration court.  Essentially every aspect of this case leaves us "more than a little puzzled," *Mece v. Gonzales*, 415 F.3d 562, 572 (6th Cir. 2005), and we would be hard pressed to point to anything in this case resembling fair and proper procedure.  Finally, it also appears to us that having vacated the finding of a frivolous application, Alexandrov would be eligible for an adjustment of status to lawful permanent resident and further proceedings on his asylum application would be unnecessary.

---

[11] Alexandrov's testimony on this point was as follows: "Q: How long were you held?  A:  I, I think I was held about 16 hours.  Q: Were you beaten?  A: Yes.  What exactly did they do to you?  A: They beat me with a club and, and hands."  It is curious that the immigration court would suggest that "I, I think I was held about 16 hours" is an incredible statement and demonstrates that Alexandrov was lying, but suggests that the statement, "I was held almost all day," is somehow more precise and would have been credible.

———————

**DISSENT**

———————

DAVID A. NELSON, Circuit Judge, dissenting. Although I am troubled by the compound hearsay on which the government's case rested, I cannot say that the immigration court's reliance on the memoranda prepared by Vice Consuls Grencik and Hazel was fundamentally unfair.

Unlike the situation presented in *Ezeagwuna v. Ashcroft*, 325 F.3d 396 (3d Cir. 2003), where an overseas consular letter challenged for lack of authentication had been repackaged over the signature of a State Department official in the United States, the authenticity of the Grencik and Hazel memoranda is not seriously questioned here. In this case, more significantly, the consular section of the embassy in Sofia unquestionably reopened its document authenticity inquiry in light of the two supposed "errors" in the Grencik memorandum — and the conclusion that the petitioner's documents were forgeries was confirmed.

The first of the supposed errors in the Grencik memorandum turned out to be no error at all; the document submitted by the petitioner to prove his alleged conviction in the regional court did indeed bear the purported signature of a Judge Nikolov (the surname of the purported translator as well), and Mr. Hazel reaffirmed that the regional court had no judge of that name in 1996. Mr. McGruder's testimony was not to the contrary; he simply explained that the Hazel memoranda (identical copies had apparently been transmitted on September 21 and September 30, 1998) advised that the judge "named" in the questioned document was Nikolov. Mr. McGruder did not say that there actually was a judge of that name on the court in 1996. And according to Hazel the other defects that Ms. Grencik had pointed out in the petitioner's purported conviction — namely that the form used was one employed only in civil cases and that the archives department of the regional court said that the court had no record of such a decision — still evidenced the document's lack of authenticity.

The consular section's reexamination of the matter yielded an important piece of new information that had been overlooked initially: the case number on the purported conviction, according to court records, was that of a specified civil case having no apparent relation to the petitioner. This datum, if true, is obviously not insignificant.

As far as the purported NIS subpoena was concerned, it turned out that Ms. Grencik had been in error as to the issuance date shown on the document. Mr. Hazel stated that the NIS had no record of having issued a subpoena on the corrected date, however. He also reiterated that the NIS did not employ an individual with a name corresponding to that shown on the document, and he confirmed Ms. Grencik's earlier report that it was unheard of for the NIS to summon anyone to the regional court, a court that had independent subpoena authority and used its own subpeona forms.

It is true that neither Ms. Grencik nor Mr. Hazel claimed to have spoken directly with the NIS or with the archives department of the regional court. I think we must assume, therefore, that the vice consuls were relying on information given them by a local investigator hired by the embassy. It would obviously have been preferable for the memoranda to have identified this investigator by name. We know that the State Department routinely relies on hired investigators in the normal course of business, however, and, for whatever it may be worth, both of the vice consuls were vouching for the accuracy of the information provided in this instance.

The information provided was not without specifics. Given adequate time, I believe, the petitioner should have been able to counter at least some of the factual representations set forth in the memoranda had those representations been untrue. Because of the peculiar procedural course

this case took, the petitioner had more than ample time in which to seek evidence tending to show that the subpoena and the conviction were authentic after all — yet no such evidence was produced.

The decision in which the immigration judge initially found the subpeona and conviction to be forgeries was rendered at a hearing held on September 30, 1998.  A copy of the Grencik memorandum had been sent to the petitioner more than six months earlier.  The Board of Immigration Appeals remanded the case to the immigration court on February 15, 2002, moreover, and the hearing on remand was not held until August 14, 2003 — a full year and a half after the remand.  Although it now appears that the remand was intended to be limited to consideration of an adjustment in the petitioner's status, the petitioner's own lawyer believed — and not without some reason — that the case had, in his words, been "reopened for all purposes."

If the petitioner had been able to obtain relevant evidence on the document authenticity question prior to August of 2003, I know of no reason why it would not have been open to him to proffer such evidence at the hearing on remand.  The petitioner's failure to make such a proffer persuades me that the immigration judge did not err in adhering to his original finding that the petitioner had submitted forged documents. The forgeries were material, in my view, and I see no reason to suppose that their fabrication was not deliberate.  I would therefore deny the petition for review.