NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0376n.06

No. 10-4270

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Apr 06, 2012

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| TODOR D. ALEXANDROV, | ) | |
| | ) | |
| Petitioner, | ) | ON REVIEW FROM THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| ERIC H. HOLDER, JR., | ) | |
| Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

BEFORE:  SUHRHEINRICH, STRANCH and DONALD, Circuit Judges.

SUHRHEINRICH, Circuit Judge.  Petitioner Todor Alexandrov (Petitioner) seeks judicial review of the decision of the Board of Immigration Appeals (BIA) declaring him statutorily ineligible for adjustment of status because he had previously filed a frivolous application for asylum. For the reasons stated herein, we **AFFIRM**.

## I.  Background

Petitioner is a native and citizen of Bulgaria.  He was admitted to this country in December 1996 on a nonimmigrant student visa to attend college at McNeese State University in Louisiana. He did not attend the school.  In May 1997, Petitioner filed an administrative application for asylum based on alleged beatings and persecution he suffered as a member of Bulgaria's Omo Ilinden minority political group.  The Immigration and Naturalization Service (INS) granted his application in September 1997.

In May 1998, INS terminated Petitioner's asylee status after concluding that documents submitted in support of his asylum application were fraudulent. Petitioner was issued a Notice to Appear in immigration court and charged with removability under 8 U.S.C. § 1227(a)(1)(C)(i) for failing to comply with the terms of his student visa. In immigration court, Petitioner admitted all factual allegations and conceded removability. He added that he wished to renew his application for asylum and withholding of removal, and also seek adjustment of status based on his selection as a beneficiary of the diversity visa lottery.

On September 4, 1998, Petitioner filed an updated asylum application with the immigration judge (IJ). Before he did so, the IJ issued the requisite warnings – both orally and in writing – regarding the ramifications of filing a frivolous asylum application. Like his original application, Petitioner's renewed application claimed he had been beaten by Bulgarian authorities because of his membership in Omo Ilinden. He provided several documents in support of his asylum application, including medical certificates corroborating his receipt of treatment after the beatings, a subpoena to appear in Bulgarian court, and a court decision convicting him of membership in the Omo Ilinden group and sentencing him *in abstentia* to five years in prison. Although he said that his mother had mailed him the record of judgment from Bulgaria, he claimed to have personally obtained the medical certificates (two from a hospital in Lom, Bulgaria, and one from a hospital in Montana, Bulgaria) and subpoena.

Department of State Executive Director John McGruder, Jr. (McGruder) testified on speaker phone at the immigration court hearing. Although he admitted having no personal knowledge of Petitioner's case, he recited the conclusions of two consular memoranda from the United States Embassy at Sofia, Bulgaria that the documents provided in support of Petitioner's asylum application

2

were fraudulent. He said that he did not know the authors of the memoranda personally but had spoken to one, vice consul Mike Hazel, who "confirmed" that the consular memoranda were "accurate." A.R. at 663-64. The IJ credited McGruder's testimony and the consular memoranda and concluded that Petitioner had produced fraudulent documents as a material component to his asylum application, barring him from all forms of requested relief.[1]

Petitioner appealed the IJ's decision to the Board of Immigration Appeals (BIA) and the BIA affirmed. Petitioner then appealed to this Court. We reversed for two reasons. First, we held that Petitioner was deprived of an opportunity to respond to DHS's arguments when he was not presented with one of the two consular memoranda until the day of his hearing. *Alexandrov v. Gonzales*, 442 F.3d 395, 407 (6th Cir. 2006) (hereinafter, *Alexandrov I*). Second, we found that the IJ's substantive reliance on the consular memoranda violated Petitioner's due process rights and could not support a finding that Petitioner's asylum application was frivolous. *Id*. We observed several specific problems with the memoranda, including their failure to identify the scope and method of the investigation conducted and details about the investigator. *Id*. We were troubled, in particular, by the lack of information regarding the investigator's identity, credentials, and information sources.

---

[1] 8 U.S.C. § 1158(d)(6) states that an alien found to have "knowingly made a frivolous application for asylum . . . shall be permanently ineligible for any benefits . . . ." In turn, 8 C.F.R. § 1208.20 provides that an immigration judge or the Board of Immigration Appeals may determine that an immigrant has filed a frivolous application for asylum if it finds that "any of its material elements is deliberately fabricated." 8 C.F.R. § 1208.20. "Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant . . . has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim." *Id*. We have noted that "[a] finding of frivolousness is commonly referred to as the 'death sentence' of immigration proceedings." *Alexandrov v. Gonzales*, 442 F.3d 395, 397 n.1 (6th Cir. 2006) (citing *Muhanna v. Gonzales*, 399 F.3d 582, 588 (3d Cir. 2005)).

3

*Id*. We vacated the frivolousness finding of the BIA and remanded for a different IJ to "further consider[] . . . Alexandrov's adjustment of status to a lawful permanent resident . . . ."[2] *Id*. at 397-98.

Remanded proceedings commenced pursuant to our direction. At the master calendar hearing before the new IJ in May 2007, Petitioner withdrew his application for asylum and indicated that he wished to proceed solely on his adjustment of status claim. DHS contemporaneously informed Petitioner that, notwithstanding the withdrawal of his application, its position would remain that because the application had been frivolous, Petitioner had permanently forfeited his right to adjustment of status. The IJ ruled that all documents be exchanged within fourteen days of the merits hearing.

At the merits hearing held in July 2008, Petitioner, a medical doctor married to a United States citizen and the father of two United States citizen children, testified in support of his entitlement to adjustment of status. Consistent with DHS's position at the master calendar hearing, Moses P. Narensky (Narensky), an Assistant Attaché and Special Agent with Immigration and Customs Enforcement (ICE), stationed in Vienna, Austria, also testified. Narensky explained that he had personally traveled to Bulgaria to authenticate the documents Petitioner provided in support of his asylum application and that this investigation had determined the documents to be fraudulent. Narensky's Official Report of Investigation (Report) was admitted into evidence. Regarding Narensky's investigation into Petitioner's purported medical certificates, the IJ accurately summarized the Report's support and conclusions:

> The Report indicates that to authenticate the medical certificates purportedly issued by the Lom Hosital, Agent Narensky spoke, through an interpreter, with Dr.

---

[2] We also reversed the BIA's adverse credibility finding against Petitioner, finding that it was not supported by substantial evidence. *See id.* at 407-08.

Plamen Tzekov, the Director of the Lom Hospital, who had served in that capacity since 1991. Dr. Tzekov informed Agent Narensky that both of the medical certificates . . . were fraudulent. Dr. Tzekov told Agent Narensky that neither of the doctors named in [Petitioner's] medical certificates ever worked at the hospital. Dr. Tzekov further indicated that although both doctors were allegedly orthopedic surgeons, Lom Hospital had not hired its first orthopedic surgeon until 2003. Furthermore, Dr. Tzekov stated that while the stamp on both medical certificates reads "Lom Regional Hospital", the stamp actually used by Lom Hospital since 1982 reads "Municipal Hospital Lom." Dr. Tzekov further showed the hospital's actual stamp to Agent Narensky.

The Report indicates that to authenticate the medical certificate purportedly issued by the Montana Hospital, Agent Narensky spoke, through an interpreter, with Dr. Magarita Nitzov, Director of the Montana Hospital, who has served in that capacity since 1996 and has been a hospital employee since 1976. Dr. Nitzov told Agent Narensky that the Montana medical certificate was fraudulent because the doctor listed on the certificate never worked at the hospital, the stamp on the certificate belongs to a hospital in Sofia, not the Montana Hospital, and the hospital name on the medical certificate is incorrect.

A.R. at 63. On the issue of the subpoena purportedly issued to Petitioner, the IJ summarized

Narensky's Report as follows:

The Report states that Agent Narensky traveled to the National Investigative Service office in Montana that allegedly issued the subpoena for [Petitioner] and spoke with Deputy Chief George Nicolov. Mr. Nicolov told Agent Narensky, through an interpreter, that while the format for the subpoena was correct, had the subpoena actually been served, the bottom portion would have been detached and retained with the case file. Instead, the bottom portion of the subpoena was still attached. Mr. Nicolov checked an automated database, which he stated would contain a record of the subpoena if it were actually issued to [Petitioner]. Mr. Nicolov indicated to Agent Narensky that there was no record of any case involving [Petitioner] in the automated database.

A.R. at 64. Finally, the IJ noted the following in the Report with regard to the alleged record of

judgment Petitioner received from his mother:

Finally, the Report indicates that Agent Narensky traveled to the Lom Courthouse to authenticate a document which purports to be a court decision sentencing [Petitioner] to five years in prison and imposing a fine for his activities with Omo Ilinden. Agent Narensky was not permitted to enter the courthouse under

5

Bulgarian law as he was a foreign law enforcement agent. The [Foreign Service National Investigator] FSNI accompanying Agent Narensky entered the courthouse to authenticate the document. Agent Narensky reported that the FSNI told him that the FSNI spoke with Clara Lubenova, the Lom Court Archives Chief since 1994, who indicated the document was fraudulent. The FSNI told Agent Narensky that Ms. Lubenova believed the document was fraudulent as the document was entitled "Decision" and not "Sentence," as an authentic document would have been; although the prosecutor V. Nikolov exists, the signature is not that of V. Nikolov and V. Nikolov's title was not Chairman as of the date of the document; there was no record in the computer database of a case involving [Petitioner]; case numbers had not reached the number 135 as of the date of the document; and the jury members "Strateva" and "Arnaudov," Secretary "Danailov," and Prosecutor "Georgiev" have never been members of the Court of Lom.

A.R. at 64-65. Despite having received Narensky's Report approximately one month before the merits hearing and being on notice since at least May 2007 that DHS would claim his documents were fraudulent, Petitioner failed to offer convincing explanations for the discrepancies revealed in Narensky's investigation.[3]

Attentive to the concerns we raised in *Alexandrov I* regarding the reliability of unsupported hearsay evidence, *see Alexandrov I*, 442 F.3d at 404-07, the IJ declined to afford any weight to Narensky's investigative conclusions regarding Petitioner's alleged record of judgment. She found that because Narensky was not allowed inside the courthouse and received his information second-hand from the Foreign Service National Investigator who spoke with the Lom Court Archives Chief, his recorded conclusions were "double hearsay" and "inherently less reliable." A.R. at 73. Based on Narensky's Report and testimony regarding Petitioner's purported medical certificates and subpoena, however, the IJ found that Petitioner had previously filed a frivolous application for asylum and was statutorily ineligible for an adjustment of status. On appeal, the BIA adopted much

---

[3] On appeal, Petitioner claims he was not given appropriate time to respond to DHS's allegations. Because Petitioner had been on notice of DHS's position for at least a year and received Narensky's Report further in advance of the merits hearing than even the IJ required, we reject this argument.

of the IJ's reasoning and affirmed.  Now, for a second time, Petitioner asks us to review the BIA's

finding that he willfully submitted fraudulent documents in support of his petition for asylum.  For

the reasons stated, we reject each of Petitioner's arguments and deny his petition for review.

## II.  Analysis

### A.  Standard of Review

Where, as here, the BIA summarily adopts the opinion of the IJ and provides additional

commentary, we review both decisions.  *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005).

Under established principles of deference, we defer to an agency's interpretations of its own

regulations unless they are plainly erroneous or inconsistent.  *Chevron U.S.A., Inc. v. Natural Res.

Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  The IJ's findings of fact, including the

determination that an asylum application was frivolous, are reviewed under the substantial evidence

standard and "are conclusive unless any reasonable adjudicator would be compelled to conclude to

the contrary."  8 U.S.C. § 1252(b)(4)(B); *see Lazar v. Gonzales*, 500 F.3d 469, 475 (6th Cir. 2007).

If an alien knowingly files a frivolous asylum application, he is statutorily ineligible for

adjustment of status.  8 U.S.C. 1158(d)(6); 8 C.F.R. § 1208.20; *In re Y-L-*, 24 I & N Dec. 151, 155

(BIA 2007).  To support a finding that the alien has filed such an application, the court must

determine, by a preponderance of the evidence based on circumstantial or direct evidence and taking

into account any plausible explanations provided by the alien, that he deliberately fabricated material

elements of his application.  *See In re Y-L-* 24 I & N Dec. at 158; *see also* 8 C.F.R. § 1208.20.  The

penalty for filing a frivolous application will not apply unless the alien has been warned of the

consequence of filing a frivolous application.  8 U.S.C. 1158(d)(6); 8 C.F.R. § 1208.20; *In re Y-L-*,

24 I & N Dec. at 155, 159-60.

### B. Prior vacature of the BIA's frivolousness finding

As a threshold matter, Petitioner contends that our vacature of the BIA's prior finding that Petitioner had filed a frivolous application for asylum prevents the IJ, the BIA, or this Court from again adjudicating the issue. We disagree. While in *Alexandrov I* we opined that further consideration of Petitioner's asylum application appeared to be unnecessary, *see Alexandrov I*, 442 F.3d at 409, our opinion was clearly predicated on the fact that DHS's only evidence supporting a finding that Petitioner's application was frivolous was hearsay, and reliance thereupon by the IJ and the BIA violated Petitioner's right to due process. *See id*. (vacating frivolousness finding and remanding for further proceedings). Indeed, the authenticity of a prior asylum application is *always* a relevant inquiry in proceedings to determine a petitioner's eligibility for adjustment of status because a statutory bar to relief is erected against those who have filed frivolous applications. *See* 8 U.S.C. § 1158(d)(6) (requiring that an alien who "knowingly made a frivolous application for asylum . . . shall be permanently ineligible for any benefits"); 8 C.F.R. § 1208.20 (authorizing IJs and the BIA to make a frivolousness finding on appropriate evidence).

On remand, the new IJ addressed the authenticity of Petitioner's application anew without any reliance on the faulty consular memoranda. Indeed, in determining Petitioner's statutory eligibility for relief, the IJ took obvious care to consider only new evidence that satisfied the standards we found lacking in the memoranda upon which the original IJ's frivolousness finding was based. The IJ expressly declined to afford any weight to Narensky's investigation into Petitioner's purported record of judgment, for example, finding it "inherently less reliable" because Narensky's testimony and Report were "double hearsay" accounts from the FSNI who was allowed to enter the courthouse. A.R. at 73. As the IJ fairly approached the topic of Petitioner's asylum application,

8

disregarding the consular memoranda entirely and applying strict evidentiary standards to ensure reliability, we reject Petitioner's claim that the review of a material element of his eligibility for relief was improper.

### C. Petitioner's withdrawal of his application for asylum

Petitioner also claims that the formal withdrawal of his application for asylum should prevent reconsideration of its authenticity. As we observed in *Lazar*, this contention is "plainly wrong." *Lazar*, 500 F.3d at 476, 478 ("[W]ithdrawal of [an] asylum application d[oes] not obviate the need for the IJ to determine whether his false application should be deemed frivolous."). To the contrary, the act of submitting false documents in support of an asylum application is always relevant—and a statutory bar—to an immigrant's eligibility to stay in this country, although it does not preclude the alien from seeking withholding or removal. *See* 8 U.S.C. § 1158(d)(6); 8 C.F.R. § 1208.20, *supra*; *Lazar*, 500 F.3d at 475.

### D. Evidence supporting the BIA's finding

Assuming this Court reaches the merits of his claim for adjustment of status, Petitioner maintains that he is not statutorily barred from relief because the new IJ relied upon an investigation just as cursory and flawed as the one we rejected in *Alexandrov I*. Again, we do not agree.

The evidence of document fraud DHS presented at Petitioner's remanded proceedings was qualitatively different than the evidence it presented at Petitioner's first hearing. In *Alexandrov I*, we found that DHS's original investigation was nothing more than an unreliable hearsay account because we did not know any relevant information "aside from the apparent conclusions of [DHS's] mysterious investigation." *Alexandrov I*, 442 F.3d at 407. In particular, we did not know (1) "who the investigator was or if there was more than one investigation or the qualifications of a supposed

9

investigator[;]" (2) whether the memoranda authors themselves "participated in the investigations[;]" (3) "whether a Bulgarian investigator was used[;]" (4) "how the investigation was conducted[;]" or (5) "who provided the Department of State with the information from the court, NIS, or hospitals." *Id*. A review of the evidence presented at Petitioner's remanded hearing shows that DHS systematically corrected these deficiencies and that substantial evidence supports the BIA's adoption of the new IJ's finding that Petitioner had filed a frivolous asylum application.

### 1. Medical Certificates

Narensky's Report contains ample information on which the BIA's conclusion that Petitioner's purported medical certificates are fraudulent is appropriately based. The concerns we expressed in *Alexandrov I* about the investigator and his investigation no longer give us pause. We know that Narensky himself was the primary investigator, accompanied to both hospitals by the FSNI, who served as an interpreter. We know the specific representatives with whom Narensky spoke at each hospital and the reasons behind each individual's conclusion that Petitioner's medical certificates were fraudulent. At Lom Hospital, for example, we know that Narensky spoke with hospital director Dr. Plamen Tzekov. Dr. Tzekov, who had served as Director at Lom since 1991, provided three separate reasons why the Lom certificates were inauthentic. First, neither doctor listed on the certificates had been employed by the Lom Hospital. Second, while both listed physicians were orthopedic surgeons, the hospital had yet to hire its *first* orthopedic surgeon by the year in which the certificate was supposedly issued. Finally, the stamp used on Petitioner's certificates differed in wording from the stamp the hospital actually used on its documents. Narensky testified that Dr. Tzekov showed him the real stamp used by Lom Hospital and that he was able to observe the difference between the two firsthand.

10

Narensky provided similar details regarding his trip to Montana Hospital. There, too, we know that Narensky spoke with the Hospital Director. The director, Dr. Magarita Nitzov, had supervised the hospital since 1996. Like Dr. Tzekov, Dr. Nitzov told Narensky that the physician listed on Petitioner's medical certificate never worked at her hospital. Also similar to Dr. Tzekov, Dr. Nitzov informed Narensky that she identified Petitioner's document as a forgery because it had been marked with a stamp for a hospital in Sofia, Bulgaria, and not the stamp used by the Montana Hospital. Finally, Dr. Nitzov told Narensky that the very name of the hospital was incorrectly listed on the certificate.

### 2. Subpoena

There is comparable support for the BIA's determination that Petitioner's alleged subpoena was also fraudulent. To investigate the document's authenticity, Narensky traveled to the National Investigative Service office in Montana from which it supposedly originated. Again, we know Narensky was accompanied by an interpreter. Once he arrived at the office, Narensky met with Deputy Chief George Nicolov. Nicolov informed Narensky that he believed the subpoena was a forgery because, had it actually been served on Petitioner as he claimed, the bottom portion of the document would have been removed for placement in Petitioner's case file. Further, Narensky's Report reveals that when Nicolov searched the electronic database for any records relating to Petitioner, there were none whatsoever.

At bottom, Narensky's testimony and Report reveal an investigation that suffers from none of the flaws we identified in *Alexandrov I*. This investigatory improvement, coupled with the compelling fact that none of the interviewed authorities viewed Petitioner's documents as genuine

11

or had any record of Petitioner that could corroborate his claims, convinces us that the BIA's finding, which is itself afforded great deference, is supported by substantial evidence.

### D. Petitioner's knowledge of the fraud

Petitioner's final contention is that even if the documents in support of his application were fraudulent, DHS did not prove that he knew of the fraud. As Petitioner claims he personally retrieved the medical certificates from the hospitals in Lom and Montana, respectively, and the subpoena from the secretary at a police station, however, he is logically estopped from claiming lack of knowledge that they were forgeries. *See* A.R. at 76. ("As [Petitioner] testified he himself obtained these documents, he cannot cast the blame for the procurement of the fraudulent documents elsewhere."). Moreover, Petitioner failed to offer any convincing explanation as to why the documents failed to bear the markings of their authentic counterparts or why no individual at any investigated institution had a record of him to corroborate his testimony. Accordingly, we find the BIA's conclusion that Petitioner knew that his documents were fraudulent to be supported by substantial evidence. *See Sterkaj v. Gonzales*, 439 F.3d 273, 277-78 (6th Cir. 2006) ("From fraudulent submissions, [t]riers of fact may presume a purpose to defraud in the absence of a persuasive explanation.").

### III. CONCLUSION

For the reasons stated herein, we **AFFIRM**.

12